Nitoj P. Singh (SBN 265005)
Mark P. Meuser (SBN 231335)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
T: 415.433.1700
nsingh@dhillonlaw.com
mmeuser@dhillonlaw.com

Matthew S. Sarelson (*pro hac vice* forthcoming)
DHILLON LAW GROUP INC.
2100 Ponce de Leon, Suite 1290
Coral Gables, FL 33134
T: 305.773.1952
msarelson@dhillonlaw.com

*Attorneys for Plaintiffs CAROLYN MARIE FERRARO,
and MICHELINA PAPA*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| CAROLYN MARIE FERRARO; and MICHELINA PAPA, <br><br> Plaintiffs, <br><br> vs. <br><br> TRILLER, INC., <br><br> Defendant | Case No.: <br><br> **COMPLAINT** <br> **(JURY TRIAL DEMANDED)** |

Plaintiffs Carolyn Marie Ferraro and Michelina Papa, hereby sue Defendant Triller, Inc., as follows:

1



Complaint

**INTRODUCTION**

1. For nearly two years, social media personalities Carolyn Marie Ferraro and Michelina Papa partnered with an upstart but very promising social media company, Triller, Inc. or Triller, to create and supervise the creation of original content. They created a social media presence known as "Troope House." Ms. Ferraro and Ms. Papa provided their services without compensation in light of repeated promises by Triller that they were due a significant payout once Triller's finances improved. Plaintiffs upheld their end of the bargain and were good faith partners with Triller. Triller, however, reneged and never paid them a dime. When Triller started paying some, but not all, content creators, they raised the issues with Triller management. Triller management responded, in writing, that they would not be paid anything, that it was only paying black creators, and that it was immediately terminating the partnership.

2. This lawsuit follows. The Parties were business partners. The Plaintiffs created original content and supervised the production of original content created by other social media personalities. Triller handled the technology side of the partnership – creating the platform and user interface. The Parties never memorialized their partnership in a formal document. Triller repeatedly assured them, prior to filing suit, that no contracts or agreements of any kind exist. As a practical matter, the Parties were common-law partners. The Partnership assets belong to the Partnership. The Partnership assets are likely worth millions of dollars.

3. In the alternative to a common-law partnership, this action is also brought to recover unpaid minimum wages, unpaid overtime, and other monies pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"); the California Labor Code §§ 200 *et seq.*, and §§ 1171 *et seq.* ("Cal. Lab. Code"); and the California Corporations Code §§ 16100 *et seq.* ("Cal. Corp. Code").

4. This is also an action for the denial of equal benefits on the basis of race, pursuant to 42 U.S.C. § 1981.

//

2

5. Before instituting a compensation structure for all creators, Defendant Triller created a $14 million fund to compensate only creators who were Black, as part of its "Black Creators Fund." As of the filing of this complaint, Triller has not and does not compensate content creators who are Caucasian, Asian or Hispanic.

6. Should this Court ultimately determine that Plaintiffs Ferraro and Papa are more properly classified as employees of Defendant and not partners, Defendant Triller has failed to compensate Plaintiffs the minimum wage or overtime wages for services performed at the direction, and for the benefit, of Defendant, despite having been induced to perform such services by Defendant's assurances of compensation.

7. In the alternative, this is also an action for quantum meruit, unjust enrichment, and promissory estoppel pursuant to the quasi-contractual nature of the relationship between Defendant Triller and Plaintiffs Ferraro and Papa.

8. Plaintiffs provided services to the benefit of Defendant Triller based on a well-founded understanding that they would be compensated for such services.

9. Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201 ("Declaratory Judgment Act") and a distribution of their interest in shared Partnership assets against Defendant Triller for breach of partnership agreement; unpaid minimum wages and unpaid overtime wages under the FLSA and the California Labor Code; violation of 42 U.S.C. § 1981 for denial of equal employment benefits on the basis of race; and damages arising under the quasi-contractual claims of quantum meruit, unjust enrichment, and promissory estoppel.

## JURISDICTION

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under 29 U.S.C.A. § 206, also known as the Fair Labor Standards Act ("FLSA") and 42 U.S.C. § 1981.

11. Alternatively, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because Plaintiffs are citizens of New Jersey and England, and Defendant is a Delaware

3

corporation domiciled in California.   The amount in controversy exceeds $75,000, exclusive of interest and costs.

**VENUE**

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Triller, Inc., is domiciled in Los Angeles, California.

**PARTIES**

13. Plaintiff Ferraro is over the age of 18 and a resident of New Jersey.

14. Plaintiff Papa is over the age of 18 and a resident of the United Kingdom.

15. Defendant Triller is a Delaware corporation with its principal place of business in Los Angeles, California.

**FACTS**

16. Triller is a relatively new social media platform similar to YouTube or TikTok.

17. Plaintiffs Ferraro and Papa are founding members of "Troope House," a collective of social media content creators that began in October 2020.

18. The content creators that comprise Troope House are located across the United States and numerous foreign countries.

19. Plaintiffs Ferraro and Papa were responsible for coordinating and planning the specific content that Troope House posted on a variety of social media websites and platforms.

20. Plaintiffs posted Troope House content on Triller's social media platform, including its website at "Triller.co" and on Triller's mobile applications.

21. Plaintiff Ferraro opened an account on Defendant Triller's social media platform on August 28, 2020.

22. Plaintiff Papa opened an account on Defendant Triller's social media platform on July 17, 2020.

23. On September 17, 2020, Ms. Ferraro reached out to Kendra Johnson, then the Content Moderation Manager for Triller, to inquire about potential opportunities with Triller. Today, Ms. Johnson's title is Senior Talent Growth Manager for Triller.

4

24. On October 10, 2020, Ms. Johnson contacted Ms. Papa to suggest potential opportunities that she could pursue with Triller.

25. In or around October 2020, Ms. Papa and Ms. Ferraro attended a series of Zoom meetings, along with other content creators, in which Ms. Johnson encouraged the participants to post content on Triller instead of rival social media platforms.

26. In or around October 2020, Ms. Papa created a "WhatsApp" group chat that included Ms. Ferraro, Ms. Johnson, and other content creators who had attended the Zoom meetings.

27. On October 3, 2020, Ms. Papa first proposed the innovative concept of a virtual creator house, where members from around the world could collaborate on videos remotely, during a Zoom meeting that included Ms. Ferraro, Ms. Johnson, and other content creators.

28. As part of her concept, Ms. Papa emphasized the importance of selecting a unique name for the virtual creator house so that it could more easily attract a community of followers.

29. During this Zoom meeting on October 3, 2020, Ms. Ferraro suggested that the name of the virtual creator house should be a derivation of the word "troupe."

30. After some collaborative discussion, the group collectively decided to change the "u" to an "o" to create a distinctive name that was their own.

31. Based on Ms. Johnson's assurance to the group that if successful, Triller would provide them with an actual house where members could live and collaborate on content together, the group decided to add "house" to the end of its name.

32. Following the collaborative process described above, the group ultimately adopted Ms. Papa's proposal of forming a virtual creator house and determined that it would assume the name of "Troope House" based on Ms. Ferraro's suggestion.

33. On November 4, 2020, Ms. Johnson asked Ms. Ferraro and Ms. Papa whether they would assume the position of "Captains" for the Troope House channel on Triller. As "Captains," the Plaintiffs would supervise other content creators for Triller.

5

34. Ms. Johnson informed Ms. Ferraro and Ms. Papa that assuming the role of Captain for Troope House entailed additional responsibilities, including weekly status meetings, regular phone calls, ensuring that the content produced by Troope House met deadlines set by Triller, developing new content ideas with input from Troope House members, and producing and editing Troope House's content.

35. For their efforts in growing the Troope House channel as Captains, Ms. Johnson made an express oral assurance to Ms. Ferraro and Ms. Papa they would be compensated for their work once Triller could afford to do so. The Plaintiffs agreed to provide services to Triller knowing that the company would eventually be able to pay.

36. Ms. Johnson also professed that by performing services for Triller, Ms. Ferraro and Ms. Papa would become "Triller Stars." Once "Triller Stars," Ms. Johnson asserted, the lives of Ms. Ferraro and Ms. Papa would change forever – they and the rest of Troope House would be flown to Los Angeles to live in a 'content house' and become acclaimed, wealthy, social media celebrities.

37. Based on these assurances by Ms. Johnson, Ms. Ferraro and Ms. Papa continued their partnership with Triller. They agreed to provide their production and management services as Captains of Troope House in exchange for the assurance of future compensation once Triller had the financial means to compensate its Channel Captains and top creators, as other social media websites do.

38. On November 26, 2020, Ms. Papa created an email account – "troopehouse0@gmail.com" – to manage the social media activity of Troope House. Ms. Papa was and remains the owner of this Gmail account. She did not open this Gmail account at the request or direction of anyone at Triller; nor did she open this account for Triller.

39. With the "troopehouse0@gmail.com" account, Ms. Papa created Troope House accounts on TikTok, Instagram, and Twitter. Ms. Papa was and remains the owner of the Troope House accounts on these social media apps. She did not create these social

6

media accounts at the request or direction of anyone at Triller; nor did she open this account for Triller.

40. At no point did Ms. Papa cede control over any of the Troope House accounts on other social media platforms to Defendant Triller.

41. As Captains of the Troope House channel on Triller, Ms. Ferraro and Ms. Papa worked an average of 40 hours per week, including most holidays – such as Christmas, Easter and Thanksgiving – when themed content was in particular demand by Triller. The Plaintiffs committed their full-time efforts to Triller.

42. Ms. Ferraro and Ms. Papa regularly used and communicated with Triller through Triller owned Slack channels.

43. Often during Triller's internal meetings, when a content concept was proposed that Triller needed to be well executed, Triller staff would turn to Ms. Johnson and ask if she could ask Troope House to do it.

44. As the Senior Talent Growth Manager at Triller, Ms. Johnson served as the primary intermediary between the Triller organization, and Ms. Ferraro and Ms. Papa.

45. Ms. Johnson regularly contacted Ms. Ferraro and Ms. Papa to request that Troope House create specific content that Defendant Triller wanted on its social media platform. These assignments typically included a deadline. For each of these assignments, Ms. Ferraro and Ms. Papa were solely responsible for producing and editing the content created by Troope House.

46. In addition to their responsibilities as Captains, Ms. Ferraro and Ms. Papa created promotional content and training material for Defendant Triller, independent of Troope House, including: promotions for record labels, fights, and other events that Triller was sponsoring; the creation of on-boarding videos to train famous social media influencers that Triller was onboarding to its social media platform; providing advice and direction to Triller's Technical Department by suggesting new features that would make the Triller app more user friendly; and "Triller Tips" videos that showed new users how

to use the Triller app; and supervising, editing, and scripting content for virtual creator house "Club Trill."

47. Ms. Ferraro and Ms. Papa also performed work as brand ambassadors for Triller by enticing content creators with large followings on other social media platforms to join Triller. Ms. Johnson would create a WhatsApp group chat with Ms. Ferraro, Ms. Papa, and the interested creator to facilitate collaboration and training to ensure that the new Triller user was committed to posting their content on Triller going forward.

48. Troope House thrived under the committed and able leadership of Ms. Ferraro and Ms. Papa, rapidly increasing its following across a variety of social media platforms and quickly becoming one of the most popular channels on Triller.

49. Troope House became so successful, in fact, that Defendant Triller created unauthorized, derivative versions of Ms. Papa and Ms. Ferraro's concept for different global regions, such as "Troope House France," "Troope House Italy," and "Troope House Indonesia," in addition to others.

50. Due to the dedicated efforts of Ms. Ferraro and Ms. Papa, Troope House grew to provide Defendant Triller with the precise type of viral, original content that it recognized as essential to distinguish itself as a top social media platform.

51. Prior to Ms. Ferraro and Ms. Papa's efforts to develop, manage, produce, and promote Troope House, most of the content posted on Triller bore the watermark of competing social media sites such as Tik-Tok. At that time, very few users uploaded original content to the Triller platform.

52. As a result of Ms. Ferraro and Ms. Papa's successful development of the Troope House brand, users began to upload original content to Triller that emulated the trends started by Troope House. By the end of Ms. Ferraro and Ms. Papa's tenure as Captains of Troope House, most of the content posted to Triller was original and no longer featured the watermark of competing social media sites.

53. Throughout their working relationship with Defendant Triller, Ms. Ferraro and Ms. Papa frequently asked Ms. Johnson when they would be compensated for the work

8

they were doing.  Consistently, Ms. Johnson confirmed that, as she had told them when Ms. Ferraro and Ms. Papa accepted their positions as Captains of Troope House, they would begin to be compensated in a short time, as soon as Triller could financially afford to do so.

54. On November 22, 2021, Triller announced that it would be paying a total of $14 million to black creators on its platform who had attended its conference series, "Assembly for Black Creators."

55. Ms. Ferraro and Ms. Papa first learned of Triller's decision to pay black creators from black members of Troope House, who contacted them to express that, while they were happy to finally be compensated, they were also disappointed that Ms. Ferraro and Ms. Papa still had not been, despite having done the largest share of work to advance the Troope House channel.

56. Interpreting Triller's ability to compensate black creators as a sign that Triller could now afford to pay its Captains and creators, Ms. Ferraro and Ms. Papa respectfully contacted Ms. Johnson to ask whether they too may expect to be compensated for their work in the near future.

57. In response to this reasonable inquiry, Ms. Johnson became angry, laughed at Ms. Ferraro and Ms. Papa's request, told them to "wait their turn," and hung up the phone.

58. Stunned by the hostility of Ms. Johnson, whom Ms. Ferraro and Ms. Papa had previously been on friendly terms with, Ms. Ferraro and Ms. Papa decided to direct their request to Bobby Sarnevesht, the Chairman of Triller. In the meantime, they carried on their work as Captains of the Troope House channel.

59. On December 21, 2021, Ms. Ferraro and Ms. Papa met with Mr. Sarnevesht and his Executive Assistant, Marc Perkins, over Zoom.

60. During this meeting, Mr. Sarnevesht agreed with Ms. Ferraro and Ms. Papa's contention that it was unfair some creators had been paid before others based on race.

9

Complaint

61. Mr. Sarnevesht also ensured Ms. Ferraro and Ms. Papa that everyone in Troope House would be paid in the near future and expressed an intent to fly Ms. Ferraro and Ms. Papa to Los Angeles to further discuss the issues of compensation and their future with Triller.

62. To facilitate the compensation of Troope House members, Mr. Sarnevesht requested that Ms. Ferraro and Ms. Papa send him a list that included the Triller handles, emails, and phone numbers for each of the unpaid Troope House members.

63. After this meeting with Mr. Sarnevesht, Ms. Ferraro and Ms. Papa optimistically notified the members of Troope House that they had been assured compensation would be provided by Triller soon.

64. Throughout January and February 2022, Ms. Ferraro and Ms. Papa attempted to contact Mr. Sarnevesht in order to arrange their trip to Los Angeles to meet with him in person. Due to multiple scheduling conflicts, and occasional lapses in responsiveness by Mr. Sarnevesht, they were unable to secure a meeting with him for over a month. Finally, in February 2022, a date was set for a Zoom meeting on February 24.

65. Despite having rescheduled the meeting multiple times to accommodate his schedule, Mr. Sarnevesht was unable to attend the February 24 meeting. Instead, Defendant Triller sent Mr. Sarnevesht's Executive Assistant, Marc Perkins, along with Ms. Johnson to represent its position.

66. During this February 24 meeting, Ms. Johnson assured Ms. Ferraro and Ms. Papa in unambiguous terms that Triller would begin to compensate Troope House members on or around March 1, 2022.

67. After expressing their appreciation that Troope House would soon be compensated, Ms. Ferraro asked Ms. Johnson whether she and Ms. Papa would be compensated for their past work and additional responsibilities as Captains, as Ms. Johnson had previously assured.

//

//

10

Complaint

68. Again, Ms. Johnson became visibly angry and told Ms. Ferraro and Ms. Papa that they would not be compensated for their previous work, or for their additional work as Captains of Troope House.

69. Realizing that Ms. Johnson was reneging on her promise to compensate them for their past work and additional responsibilities as Captains, Ms. Papa began to record the conversation with Ms. Johnson's expressed consent.

70. Despite their disagreements, Ms. Papa's recording confirms that by the end of the February 24 meeting, the parties had reached a clear understanding that Troope House would be compensated in the coming weeks, and that Ms. Ferraro and Ms. Papa would have a follow up meeting with Mr. Sarnevesht to discuss the issues regarding their compensation for past work.

71. After the February 24 meeting, Ms. Ferraro and Ms. Papa sent an email to Mr. Sarnevesht summarizing the meeting and requesting an appointment to meet with him.

72. Soon thereafter, without notice or warning, Ms. Ferraro and Ms. Papa were removed from the Triller group on the "Slack" messaging platform, unfollowed on social media by Triller's main accounts, and Ms. Johnson removed herself from the Troope House group chat on the "WhatsApp" messaging platform.

73. Upon realizing they had been 'locked-out' of all Triller related communication platforms, Ms. Ferraro and Ms. Papa attempted to contact Mr. Sarnevesht again to understand what was happening.

74. Mr. Sarnevesht did not respond to Ms. Ferraro and Ms. Papa's attempts to contact him. Instead, Mr. Sarnevesht also unfollowed Ms. Papa on social media.

75. On March 1, coincidentally the same day that Defendant Triller had suggested as the potential date when Troope House members could expect to receive compensation, Ms. Ferraro and Ms. Papa received an email from Elana Moline, Triller's Senior Director of Talent Strategy and Activations, stating, "Triller no longer wishes to partner with you" and ". . . rejects your request for paid agreements for future content and retribution for past content."

11

76. The March 1 email from Defendant Triller chastised Ms. Ferraro and Ms. Papa for inquiring as to when they could expect to be compensated, as Ms. Johnson had assured them.

> "For you both to see Triller's gift of paid agreements to black creators as an opportunity for your own monetary gain is incredibly disappointing and not a conversation we are open to having. It also demonstrates that you do not understand or support the Triller brand or platform."

77. The March 1 email does not mention that just one week earlier, on February 24, Defendant Triller had agreed to compensate Ms. Ferraro, Ms. Papa, and the other members of Troope House going forward, and ensured Ms. Ferraro and Ms. Papa that they could meet with Mr. Sarnevesht to discuss the issue of compensation for past work.

78. The March 1 email shows that Ms. Moline was unaware of, or intentionally omitted, the assurances made by Ms. Johnson to Ms. Ferraro and Ms. Papa of payment for past work and additional payment for undertaking Captain responsibilities.

79. On March 4, 2022, Triller held a virtual meeting that included Ms. Johnson, the remaining members of Troope House, and Dina De La Rocha, Triller's Director of Community and Talent Growth.

80. During this meeting, Ms. Johnson and Ms. De La Rocha implored the members of Troope House to stay with Triller, despite having terminated the Captains of Troope House, Ms. Ferraro and Ms. Papa.

81. Also, during the March 4 meeting, neither Ms. Johnson nor Ms. De La Rocha informed the members of Troope House of the assurance given to Ms. Ferraro and Ms. Papa on February 24, that compensation for all creators would begin sometime in early March. Instead, Defendant Triller returned to its previous position that they were 'working' to get Troope House creators paid, and 'that their time would come.'

12

Complaint

82. On March 14, 2022, Ms. Johnson posted a video of herself at Defendant Triller's "Assembly for Black Creators" to her Instagram account, where she boasted that she was "making sure that we get [black creators] paid, because that's what we do."

83. On April 5, 2022, Defendant Triller created a new Instagram account, "@troopehouseofficial," using content that Ms. Ferraro and Ms. Papa had scripted and edited before Defendant ended its partnership with them.

84. To date, Defendant Triller has not fulfilled its obligation to compensate Ms. Ferraro or Ms. Papa.

85. As Defendant Triller's General Counsel, Darren Traub, stated in an email sent on March 8, 2022, Triller is of the belief that "Troopehouse and its social media accounts are highly valued and significant assets of Triller."

86. In early 2022, Defendant Triller received a valuation of $5 billion. This represents a three hundred percent (300%) increase in value from October 2020, when Ms. Ferraro and Ms. Papa first created Troope House.

87. Much of Triller's success during this time frame can be attributed to the viral success of Troope House channels, originally created by Plaintiffs Ferraro and Papa.

88. Triller partnered with the Plaintiffs with the understanding that all parties would be reap the benefits of the partnership. To date, the Plaintiffs have not been compensated one penny, despite committing their full-time efforts to the partnership for two years and even though Triller continues to use the Plaintiffs' name, image and likeness and the original content that they created.

89. Triller recently attempted to register the Troope House mark, but intentionally failed to disclose that it was created by Ms. Ferraro and Ms. Papa.

90. Prior to filing suit, Triller confirmed, multiple times in writing, that there are no written contracts or agreements between the parties.

//
//
//

13

## COUNT ONE – BREACH OF PARTNERSHIP AGREEMENT
## (Cal. Corp. Code § 16405)

91. Plaintiffs repeat and reallege paragraphs 1 through 90 hereof, as if fully set forth herein.

92. Under California law, "the association of two or more persons to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Cal Corp. Code § 16202(a).

93. "No particular formalities are required to create a partnership, and whether a partnership has been created may be inferred from the parties' conduct." *Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, 965 F. Supp. 2d 1141, 1150 (E.D. Cal. 2013) (citing *Weiner v. Fleischman*, 816 P.2d 892, 895 (Cal. 1991)).

94. Here, Plaintiffs Ferraro and Papa's obligations to the Partnership were to create and produce original content, and to manage Troope House's presence on social media platforms for Defendant Triller. In effect, Plaintiffs were both the creators and the "creative side" of the Troope House brand.

95. Defendant Triller was obligated under the Partnership to compensate Plaintiffs, promote Plaintiffs' social media presence on Triller, and eventually, to provide Plaintiffs and the other members of Troope House an actual house in which they could live and create content together.

96. Plaintiffs produced, created and supervised content creation for the Partnership, while Defendant handled the technology and platform for the Partnership.

97. For a period of sixteen (16) months, Plaintiffs Ferraro and Papa performed their obligations under the Partnership in good faith, producing and editing Troope House's content, attending weekly meetings with Triller staff, organizing content that highlighted music and events sponsored by Triller, and creating "how to" videos that assisted Triller in attracting new users and Captains to its social media platform.

98. Contrary to its repeated assurances, Defendant Triller did not fulfill its Partnership obligations of compensating Plaintiffs Ferraro and Papa for their work as

14

Captains of Troope House or providing Plaintiffs and the other members of Troope House with a house in which they could live together. Moreover, Defendant Triller failed to make a good faith attempt to satisfy these obligations under the Partnership.

99. All assets of the Partnership belong to the Partnership, not to Triller.

100. Because Defendant Triller has breached its Partnership obligations and expressly dissolved its Partnership with Plaintiffs, Plaintiffs Ferraro and Papa are entitled to receive a distribution of their one-half (1/2), or 50%, share of all Partnership assets based on their equal interest in the Partnership. As Defendant Triller has recently been valued at around $5 billion, Plaintiffs' liquidated distribution of their interest in Partnership assets could be worth well more than $100 million.

101. Plaintiffs request that Triller be subject to an appropriate appraisal and that they be awarded the fair value of their interest in the Partnership.  Alternatively, the Partnership should be liquidated.

## COUNT TWO – VIOLATION OF 42 U.S.C. § 1981 FOR DENIAL OF EQUAL BENEFITS IN AN EMPLOYMENT CONTRACT

102. Plaintiffs repeat and reallege paragraphs 1 through 101 hereof, as if fully set forth herein.

103. This count is pled in the alternative to the Court or a jury finding a Partnership between the Parties.

104. 42 U.S.C. § 1981 (hereafter, "§ 1981") provides a cause of action when a person is denied equal benefits in private employment on account of his or her race. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436 (1968) (holding that a claim under § 1981 does not require a showing of state action); *accord Phillip v. Univ. of Rochester*, 316 F.3d 291, 294 (2d Cir. 2003); *see also*, *Long v. Ford Motor Co.*, 496 F.2d 500, 503, fn. 4 (6th Cir. 1974) (collecting cases holding that § 1981 prohibits racial discrimination in private employment).

105. Further, § 1981 applies in private employment cases where the plaintiff is not a member of a minority group to the same extent that it applies where the plaintiff is a

Complaint

member of a minority group. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 285-96 (1976).

106. To state a claim under § 1981 when a plaintiff is not a member of a minority group, the plaintiff must first demonstrate that an employer has considered race or sex when making an employment decision. *Johnson v. Transportation Agency, Santa Clara Cty., Cal.*, 480 U.S. 616, 625 (1987); *see also*, *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284, fn. 7 (5th Cir. 1994) (holding that the elements of claims under § 1981 and Title VII are "identical"). Once the plaintiff makes this showing, "the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision." *Id.* If the employer articulates an affirmative action program as the basis for its decision, "the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid." *Id.*

107. On November 22, 2021, Defendant Triller launched a program to pay a total of $14 million to black creators as part of its conference series, "Assembly for Black Creators."

108. At the time Defendant Triller launched this program, it had yet to compensate Plaintiffs Ferraro and Papa, despite having assured them compensation "once Triller could afford to compensate creators" for more than a year.

109. There is no valid justification for Defendant Triller's decision to compensate black creators before compensating all other creators and Captains. This is particularly true in light of the assurances of compensation that Defendant had made to various creators and Captains, including Plaintiffs Ferraro and Papa.

110. Triller has a policy of paying black creators but not non-black creators.  This violates § 1981.

111. Plaintiffs have been damaged as a result of the Defendant's violation of § 1981.

//

//

Complaint

## COUNT THREE – UNPAID MINIMUM WAGES UNDER FAIR LABOR STANDARDS ACT ("FLSA")

112. Plaintiffs repeat and reallege paragraphs 1 through 111 hereof, as if fully set forth herein.

113. This count is pled in the alternative should this Court or a jury determine that Plaintiffs were not partners of Defendant Triller.

114. At all relevant times, Defendant Triller was an "employer" within the meaning of 29 U.S.C. §§ 203(e) and 206(a).

115. At all relevant times, Plaintiffs were "employees" within the meaning of the Act.  They provided services that would ordinarily be classified as employee-service to Triller on a full-time basis for nearly two years without a penny in compensation.

116. As an employer, Defendant Triller was required to pay Plaintiffs the applicable federal minimum wage rate.

117. Defendant Triller failed to pay Plaintiffs the minimum wages to which they are entitled under the FLSA.

118. Defendant Triller failed to pay Plaintiffs for the actual hours they worked.

119. Defendant Triller has no time records, as required by the Act.

120. Defendant Triller was aware or should have been aware that the practices described in this Complaint were unlawful and have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiffs.

121. As a result of Defendant Triller's willful violation of the FLSA, Plaintiffs have suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recover of such amounts, liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## COUNT FOUR – UNPAID OVERTIME WAGES UNDER FLSA

122. Plaintiffs repeat and reallege paragraphs 1 through 121 hereof, as if fully set forth herein.

17

Complaint

123. This count is pled in the alternative should this Court or a jury determine that Plaintiffs were not partners of Defendant Triller.

124. Defendant Triller was required to pay Plaintiffs no less than one and one-half (1.5) times the regular rate at which Plaintiffs were employed for all worked in excess of forty (40) hours in a workweek pursuant to the overtime wage provisions set forth in the FLSA, 29 U.S.C. § 207, *et seq*.

125. Defendant Triller failed to pay Plaintiffs the overtime wages to which they are entitled under the FLSA.

126. Defendant Triller has willfully violated the FLSA by knowingly and intentionally failing to pay Plaintiffs overtime wages.

127. Due to Defendant Triller's violations of the FLSA, Plaintiffs are entitled to recover their unpaid overtime wages, reasonable attorneys' fees and costs of the action, liquidated damages, and pre-judgment and post-judgment interest.

## COUNT FIVE – UNPAID MINIMUM WAGES UNDER CALIFORNIA LABOR CODE (Cal. Lab. Code §§ 1194, 1197)

128. Plaintiffs repeat and reallege paragraphs 1 through 127 hereof, as if fully set forth herein.

129. This count is pled in the alternative should this Court or a jury determine that Plaintiffs were not partners of Defendant Triller.

130. Defendant Triller failed to pay Plaintiffs the minimum wages to which they are entitled under Cal. Lab. Code §§ 1194, 1197.

131. Defendant Triller has willfully violated the California Labor Code by knowingly and intentionally failing to pay the Plaintiffs minimum hourly wages.

132. As a result of Defendant Triller's violations of the California Labor Code, Plaintiffs are entitled to recover their unpaid wages, reasonable attorneys' fees and costs of the action, liquidated damages, and pre-judgment and post-judgment interest.

//

//

18

### COUNT SIX – UNPAID OVERTIME UNDER CALIFORNIA LABOR CODE
### (Cal. Lab. Code §§ 510, 1194)

133. Plaintiffs repeat and reallege paragraphs 1 through 132 hereof, as if fully set forth herein.

134. This count is pled in the alternative should this Court or a jury determine that Plaintiffs were not partners of Defendant Triller.

135. Under the California Labor Code, Defendant Triller was required to pay Plaintiffs time and one half (1.5) of the regular rate for all hours they worked in excess of forty (40). Cal. Lab. Code § 510.

136. Defendant Triller failed to pay Plaintiffs the overtime wages to which they were entitled under the California Labor Code.

137. Defendant Triller has willfully violated the California Labor Code by knowingly and intentionally failing to pay Plaintiffs the correct amount of overtime wages.

138. Due to Defendant Triller's willful violations of the California Labor Code, Plaintiffs are entitled to recover their unpaid overtime wages, reasonable attorneys' fees and costs of the action, liquidated damages, and pre-judgment and post-judgment interest.

### COUNT SEVEN – QUANTUM MERUIT

139. Plaintiffs repeat and reallege paragraphs 1 through 138 hereof, as if fully set forth herein.

140. This count is pled in the alternative should this Court or a jury determine that Plaintiffs were neither partners nor employees of Defendant Triller.

141. Plaintiffs Ferraro and Papa served as Captains of Troope House in good faith – performing duties that included scripting and editing content, organizing the posting schedule of Troope House members, and ensuring that Triller's directives regarding the incorporation of sponsored music and events sponsored by Triller into Troope House's content were met.

19

Complaint

142. For a period of around sixteen (16) months, between October 2020 and February 2022, the services performed by Plaintiff's Ferraro and Papa were accepted by Defendant Triller.

143. When Plaintiffs Ferraro and Papa initially accepted the position of Captains for Troope House, and assumed the extra responsibility that the position entailed, Defendant Triller gave Plaintiffs its oral assurance that they would be compensated for their work as Captains.

144. Throughout their working relationship with Defendant Triller, Ms. Johnson repeatedly reaffirmed Triller's commitment to compensate Plaintiffs Ferraro and Papa for the work they performed as Captains.

145. On December 21, 2021, the Chairman of Triller, Mr. Sarnevesht, ensured Plaintiffs Ferraro and Papa that they and other members of Troope House would be compensated soon.

146. On February 24, 2022, Ms. Johnson again told Plaintiffs Ferraro and Papa, after agreeing to be recorded, that they and the other members of Troope House would begin receiving compensated on or around March 1.

147. Based on the repeated representations Plaintiffs Ferraro and Papa received from Defendant Triller that they would be compensated for their work as Captains, Plaintiffs had a well-founded expectation that they would be compensated for their services.

148. Plaintiffs are entitled to fair value for their work for Triller in an amount to be determined by a jury.

<h3 style="text-align:center">COUNT EIGHT – UNJUST ENRICHMENT</h3>

149. Plaintiffs repeat and reallege paragraphs 1 through 148 hereof, as if fully set forth herein.

150. This count is pled in the alternative should this Court or a jury determine that Plaintiffs were neither partners nor employees of Defendant Triller.

//

Complaint

151. Here, the Troope House collective enriched Defendant Triller by producing desired content at Triller's request, promoting music and events sponsored by Triller, and creating "how-to" videos to help new users operate Triller.

152. As Captains of Troope House, Plaintiffs Ferraro and Papa worked full time for a period of over sixteen (16) months to produce the benefits to Defendant Triller listed in the preceding paragraph.

153. To permit Defendant Triller to obtain the full-time services of Plaintiffs Ferraro and Papa based on the false expectation of compensation, and in so doing enrich itself, would violate fundamental principles of equity and good conscious.

154. Plaintiffs are entitled to money damages as of a result of Triller being unjustly enriched by them without compensation.

**COUNT NINE – PROMISSORY ESTOPPEL**

155. Plaintiffs repeat and reallege paragraphs 1 through 154 hereof, as if fully set forth herein.

156. This count is pled in the alternative should this Court or a jury determine that Plaintiffs were neither partners nor employees of Defendant Triller.

157. When Plaintiffs Ferraro and Papa accepted the position of Captains for Troope House on November 4, 2020, Ms. Johnson made a clear and unambiguous promise that they would be compensated for the services they performed as Captains.

158. On December 21, 2021, Mr. Sarnevesht, the Chairman of Defendant Triller, made a clear and unambiguous promise that Plaintiffs Ferraro and Papa, along with the other members of Troope House, would be compensated soon.

159. On February 24, 2022, Ms. Johnson made a clear and unambiguous promise that Plaintiffs and the other members of Troope House would begin to receive compensation on or around March 1, 2022.

160. Based on these repeated assurances by Defendant Triller, Plaintiffs Ferraro and Papa reasonably and foreseeably relied on the promises that they would receive compensation for their services as Captains for Troope House.

21

161. Because Plaintiffs Ferraro and Papa relied on Defendant Triller's clear and unambiguous promise of compensation, they suffered a loss of expected wages and forewent alternative opportunities of employment.

162. Plaintiffs should be compensated by Triller due to their reliance on its promises of compensation.

**COUNT TEN – COMMON LAW TRADEMARK INFRINGEMENT**

163. Plaintiffs repeat and reallege paragraphs 1 through 162 hereof, as if fully set forth herein.

164. Plaintiffs own and use the "Troope House" trademark and enjoy common-law rights in California and throughout the United States in use of the trademark "Troope House". Moreover, Plaintiffs' rights in the trademark "Troope House" are senior and superior to any rights which Defendant may claim in and to use of that mark.

165. Defendant's use of the "Troope House" trademark for its social media content channels is intentionally designed to mimic Plaintiffs' social media content channels so as to likely cause confusion regarding the source of Defendants' content channels, in that users of those channels will be likely to associate or have associated such channels with, as originating with, or as approved by Plaintiffs, all to the detriment of Plaintiffs.

166. Defendant's infringement will continue unless enjoined.

167. Plaintiffs have suffered damages in an amount to be proven at trial.

**COUNT ELEVEN – DECLARATORY JUDGMENT (28 U.S.C. § 2201(a))**

168. Plaintiffs repeat and reallege paragraphs 1 through 167 hereof, as if fully set forth herein.

169. A bona fide dispute exists between the parties concerning ownership of the "Troope House" trademark.

170. On the one hand, Plaintiffs believe that either (i) they own the "Troope House" trademark, and derivative marks, because they created it or (ii) the Plaintiffs own it collectively with the Defendant as a Partnership asset. On the other hand, Defendant contends that it, and it alone, owns the "Troope House" trademark and derivate marks.

Complaint

171. Pursuant to 28 U.S.C. § 2201(a) (Declaratory Judgment Act), Plaintiffs respectfully request that this Court issue a declaratory judgment that:

    i.    Plaintiffs own the "Troope House" trademark, and all derivative marks; or, in the alternative,

    ii.    A partnership was formed between Plaintiffs and Defendant Triller which owned the "Troope House" trademark; and

    iii.    Defendant Triller forfeited all rights and privileges associated with use of the Troope House trademark when it disassociated itself from its partnership with Plaintiffs Ferraro and Papa.

## PRAYER FOR RELIEF

Plaintiffs Carolyn Marie Ferraro and Michelina Papa demand entry of a judgment in their favor and against Defendant Triller, Inc.:

    i.    for monetary damages, as to the wage counts for liquidated damages, and as to the trademark count for common law trademark infringement, as to the partnership claims for an appraisal;

    ii.    for punitive damages;

    iii.    for attorney fees and court costs;

    iv.    for declaratory relief;

    v.    And for any other relief deemed necessary and appropriate.

Dated: July 12, 2022                    Respectfully submitted,

By: /s/Nitoj P. Singh
Nitoj P. Singh (SBN 265005)
Mark P. Meuser (SBN 231335)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
T: 415.433.1700
nsingh@dhillonlaw.com
mmeuser@dhillonlaw.com

Complaint

Matthew S. Sarelson (*pro hac vice* forthcoming)
DHILLON LAW GROUP INC.
2100 Ponce de Leon, Suite 1290
Coral Gables, FL 33134
T: 305.773.1952
msarelson@dhillonlaw.com

24

Complaint

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: July 12, 2022                                Respectfully submitted,

By: /s/Nitoj P. Singh
Nitoj P. Singh (SBN 265005)
Mark P. Meuser (SBN 231335)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
T: 415.433.1700
nsingh@dhillonlaw.com
mmeuser@dhillonlaw.com

Matthew S. Sarelson (*pro hac vice* forthcoming)
DHILLON LAW GROUP INC.
2100 Ponce de Leon, Suite 1290
Coral Gables, FL 33134
T: 305.773.1952
msarelson@dhillonlaw.com

25

Complaint